## Berkovitz's Appeal.

398

Argued May 27, 1935. Before SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Sterling G. McNees,* with him *Gilbert Nurick* and *Charles H. Hollinger,* for appellants.

*Robert L. Myers, Jr.,* Deputy Attorney General, and *Charles J. Margiotti,* Attorney General, for appellee.

OPINION BY MR. JUSTICE KEPHART, June 29, 1935:
The Throop State Bank was conducting a general banking business. The secretary of banking, in 1930,

after an examination of the bank's affairs, determined there was an impairment of its surplus. As security for making good this impairment there was deposited with the secretary by the directors and cashier, as collateral, certificates of deposit to the amount of $18,943. On August 3, 1931, there was another examination of the bank, when a capital impairment of $75,473.39 was found, which was mostly due to a depreciation in the value of securities. The secretary insisted on additional security to make good the impairment; the directors and cashier effected a new agreement whereby there was pledged with the secretary securities (mortgages, certificates of deposit, stocks, bonds, etc.) to make good the impairment.

The bank continued in business for a short time when the Olyphant Bank, a neighboring institution, developed an impairment. Through the efforts of the officers of both banks, there was created November 24, 1931, a new corporation, known as the Mid-Valley Trust Company, having general banking powers. Separate contracts were made with Olyphant and Throop, under which the newly created trust company took over all the assets and assumed the liabilities of each. The contract of Throop dated November 27, 1931, was adopted by the directors and stockholders, and signed by the directors thereof. Under it they agreed to transfer all of the assets to the trust company, which assumed all of Throop's liabilities. There were no outstanding general creditors, the depositors being the only creditors having any claim on the assets. Mid-Valley opened for business with the assets of both Olyphant and Throop. A branch office was continued temporarily at Throop. The names on the windows, however, were changed to Mid-Valley, and all business thereafter was conducted under that name, and both Throop and Olyphant ceased to do business as such banks. Mid-Valley continued in business until February 4, 1932, when it was taken over by the secretary

of banking, as liquidator; all of the assets of both banks in possession of Mid-Valley, and all the new assets of Mid-Valley are now being used to pay the creditors of Mid-Valley, including those of Olyphant and Throop.

Shortly after the agreement between Throop and Mid-Valley, the directors who had pledged the securities requested the secretary of banking to return them. The secretary held them until after Mid-Valley closed, when all the securities were sent to the officer in charge of the liquidation of Mid-Valley. He converted the certificates of deposit, placed the proceeds in the general fund of Mid-Valley, and has paid therefrom a distribution of twenty per cent to the creditors of Mid-Valley, including, of course, depositors of Throop and Olyphant.

The pledgors filed a petition for a declaratory judgment, requesting the court to declare the securities so pledged were the property of pledgors who were entitled to their immediate return. A rule to show cause why the prayer of the petitioner should not be granted issued, to which a general replication and answer was filed; and, after a hearing at which testimony was taken, the court discharged the rule on the secretary and dismissed the proceedings. The petitioners take this appeal.

The State, through its visitorial powers affecting corporations, may set up any agency it sees fit to supervise those banking institutions incorporated by the State which have direct relation with the public. The officers exercising these functions or powers are agents of the government. Here the secretary of banking is the designated officer. He had broad powers relative to taking possession of the property of any state banking corporation under the Act of June 15, 1923, P. L. 809, section 21, and section 7 of the Act of May 5, 1927, P. L. 762; it provides that, when the secretary determines that a bank is in an unsafe or unsound condition to continue business, he may take possession of its business or property when he is of opinion that the depositors and public re-

quire protection and peremptory action. He may, when he finds an impairment of capital of a banking institution, direct that the impairment be restored or made good within a designated time, and if the impairment is not restored or made good, he may take possession of the bank as a liquidator or receiver.

Among the incidental powers necessary to a consummation of these general powers is that he may demand and receive securities to be held as collateral for any impairment in any state bank that may be found, and his power in this respect as it related to the impairment of the Throop Bank was complete. The secretary had authority to make the agreement with the directors, officers and others of the Throop State Bank whereby securities were pledged to secure the impairment of capital which was found. Under any agreement providing for the restoration or making good of an impairment of capital, whereby securities are lodged with the secretary of banking, he acts for the protection of the depositors and public. While such action is in the first instance for the bank as an institution, in reality the secretary acts for the protection of depositors and creditors, the securities being held in trust. While considerable latitude is permitted in the performance of these duties the legislature has seen fit to restrict the activities of the secretary within certain limits. Generally speaking, his powers can not be exercised unreasonably, arbitrarily or capriciously.

When the secretary of banking found an impairment of capital of the Throop Bank, it became his duty to have that impairment restored. The matter was beyond any discretionary power. Had he failed, this nonfeasance might subject him to a criminal charge.

A pledge like any other contract where there is doubt as to its meaning must be construed with some degree of strictness against the person making it: Heffner v. First Nat. Bank of Huntingdon, 311 Pa. 29, 33. Having taken the securities as a pledge for a specific purpose,

the secretary must hold them until sold for that purpose or the impairment is otherwise made good. But he can not hold the securities indefinitely. The pledgee's duty is to return to the pledgor the property so pledged whenever the obligation it secured has been discharged: Bangor Silk Knitting Co. v. Wise, 277 Pa. 415, 417. He must act consistently with conditions and the exigencies of the occasion. He could not hold for an indeterminate period the securities of the directors of Throop Bank. Upon demand by the pledgors within a reasonable time he must elect either to convert and apply the proceeds or return the securities. Likewise the secretary must employ the same energy that enabled him to discover the impairment of capital in finding that the impairment has been made good through the appreciation of securities or from other causes. The pledgee is, within certain limits, a trustee, and is therefore presumed to act for the pledgor's interest as well as his own, though their interests are not identical: Union Trust Co. v. Long, 309 Pa. 470, 477. When impairment ceases the pledged securities must be returned divested of any claims of depositors or the banking institution. His acts in these matters, when in good faith, are not open to question.

The time these securities were held by the secretary was not unreasonable, and his decision to hold them, as against Throop after it had turned over its assets to the new institution that had assumed its liabilities, was proper. The agreement between Throop and Mid-Valley had no effect on the obligation imposed on the pledge for the creditors in the secretary's possession. He was fully justified in holding the pledge, first, under his general powers given by law to protect depositors and the public, and, second, by the terms of the contract under which the pledge was made.

Pledgors of property to make good a capital impairment in a state bank must know that the State occupies a parental position in protection of the public and de-

positors who deal with that institution, so that as far as possible it may protect both.

In the agreement of pledge of August 3, 1931, the directors "desire to secure the corporation against loss by reason of the aforesaid impairment." The "loss" because of "impairment" is the loss depositors and the public would suffer. These were to be protected. The agreement further stated, the securities "shall be held . . . in trust as collateral security for the making good of the impairment of capital . . . or of any such additional impairment arising from any cause whatsoever." We conclude from the latter part of this excerpt, that the agreement held the pledge against any impairment up to the time Throop transferred its assets to Mid-Valley. Every depositor at that time (there are no general creditors) had a claim on the general assets, as well as a claim through the bank on the property pledged, for the amount of their deposits. The pledged property must be held to respond to that claim at that time if the assets are deficient or, in the judgment of the secretary, it has been necessary to convert and apply the securities.

Appellant argues that the statements of the Throop and Olyphant Banks contained in the transfer agreements to Mid-Valley showed no impairment of capital of either bank. These statements of the officers are at best self-serving and will not conclude the depositors, creditors, or the banking department though the latter assents to the transfer and the incorporation of the new institution. If the secretary believed that no impairment then existed the pledge should have been returned. The testimony here shows the contrary, but if that is not correct it may be fully developed later.

The position of the depositors (creditors) of Throop as it relates to these pledged securities when the new institution, Mid-Valley, took over the assets of Throop and Olyphant Banks may be stated as follows: The fact that a depositor had a claim against the general assets of the bank at the time they were transferred to Mid-Valley

would not diminish or extinguish his claim against the property pledged to secure an impairment of capital so intimately related to deposits. The fact that under such circumstances recourse may be had to two funds in no way affects the creditor's right to proceed against either or both so long as he does not secure an advantage (Union Trust Co. v. Long, supra) though in proceeding against one of the funds the creditor may be compelled to work out his rights through the bank, the nominal beneficiary.

Under the agreement between Throop and Mid-Valley, all of the assets of every kind and character belonging to the bank were transferred to Mid-Valley. While the secretary of banking held the securities as collateral against an impairment of Throop, the equitable title was vested in the Throop bank for the benefit of its depositors and creditors. The pledge agreement expressly created a trust. The securities "shall be held . . . in trust." If the agreement had not so stated, the law would so declare it. This equitable title and claim passed to Mid-Valley under the agreement between Throop and Mid-Valley; it specifically stated that "all estate and property, real and personal, title to which is now vested legally or equitably in it" were transferred. The pledge agreement contemplated an assignment, for, in speaking of the sale of the securities and disposition of the proceeds to Throop, it stated, or "to such corporation as may at the time be the successor or assignee thereof."

It is fundamental that pledged property can not be subjected to liabilities not contemplated in the agreement of pledge (Heffner v. First Nat. Bank of Huntingdon, supra, at page 29), *and when that equitable title and claim to benefits passed to Mid-Valley or its liquidator it was for a specific purpose of making good the impairment of capital as it affected the creditors and depositors of Throop.* It could not be applied to an impairment of Olyphant or in relief of its depositors, or the new deposi-

tors of Mid-Valley. Nor may it be applied to situations affecting Throop creditors who have, through conduct subsequent to the transfer from Throop to Mid-Valley, released the pledge, or who by estoppel from acts prior thereto have accomplished the same result. These features will be discussed later. Mid-Valley's liquidator must hold the securities for the purpose for which they were pledged, the creditors of Throop who still hold valid claims against the pledge. Neither he nor the secretary have power to divert them or their proceeds to other liabilities.

The question first to be determined is: What was the condition of Throop at the time the transfer was made as to the impairment of its capital? Then what are the claims of the depositors of Throop once Mid-Valley took it over? Underlying this is the position of those who consented or agreed to the substitution of Mid-Valley for the liability of Throop and those who did not consent or agree to such substitution. As to the latter, there may be those whose conduct implies an agreement to accept the responsibility of Mid-Valley. These questions can not be determined in a proceeding of this character. It will arise through an accounting and must be determined after a submission and careful review of the facts. The secretary's representative is in Lackawanna County; all the banking institutions are located there; the account must come through the courts of that county; it is the only county under the act that can lawfully administer the rights of the pledgors and the rights of the depositors and creditors.

Appellant very strongly argues, and with much merit, that many of these depositors have recognized the new bank; that they have dealt with it, and by their conduct have accepted its liability for that of Throop. If that is the case, then these pledgors are relieved of liability on their pledge, and to that extent the pledged securities or their proceeds should not be held liable. The Commonwealth does not undertake to supervise or care

for depositors who of their own volition accept new parties as liable for a debt that was owed to them by another institution.

We wish to make it clear that when the secretary of banking finds an impairment of capital in an institution, and calls on the officers of that institution to make good the impairment, and such making-good or restoration is done by depositing securities with the secretary, they can not denude themselves of liability and have a return of the pledged property by creating a new corporation, transferring all the assets of the old corporation to it, with an agreement that the latter shall assume all liabilities. The depositors of the old institution who have not agreed to such an arrangement may follow the assets into and through the new institution, and the depositors, as creditors, through the banking department, may reach out and take all the equities or property of the banks that may be found, and have it applied to their claim. They may reach property that is pledged in the hands of the secretary for impairment and have it so applied. In this case the depositors of Throop who were taken over by Mid-Valley, who did not consent to such an arrangement, and who by their conduct did not agree to accept Mid-Valley's responsibility for this deposit, in other words, whose conduct did not amount to a novation, may follow these securities and have them applied to the liquidation of their claims.

We have decided similar questions with respect to building and loan associations (Weinroth v. Homer B. & L. Assn., 310 Pa. 265), and those nonconsenting shareholders who refused to join a merged company, and we have also decided in other cases that creditors of one corporation may follow the property or assets of such corporation into a new corporation where there has been a merger, or, in cases of fraudulent transfer. See Halpern v. Grabosky, 296 Pa. 108, 111; Merwine v. Mt. Pocono, 304 Pa. 517, 522; Delphia Knitting Mills Co. v. Richards, 62 Pa. Superior Ct. 9, 12.

The appellant argues that inasmuch as the property of Olyphant and Throop has been combined and blended it is so mixed up that it will be exceedingly difficult to unravel and segregate the various claims. It is just another case of unscrambling eggs. The primary consideration of the court as well as of the State is that the depositors shall not suffer through any conduct of bank officers, if that may be avoided. It was under the management of Throop, through its board of directors, that the bank suffered an impairment of capital to the detriment of depositors. It was these directors who pledged the property now in question. It was the directors of Throop that made the agreement with Mid-Valley, through themselves and others, to take over the assets and assume the liabilities of Throop. It is the pledged property of the directors of Throop that is now in question, and, while the problem of separation may be difficult, difficulties must not stand in the road of securing for the depositors the money which the pledged property stood for.

The court below properly passed on the questions presented by the contracts and incidental questions arising thereunder. Accounting as related to these banks is not within the jurisdiction of Dauphin County courts.

One other question remains. Clearly the fifth paragraph of the pledge agreement required the earnings from the certificates of deposit, mortgages and bonds to be paid to the pledgors until they were actually sold, converted and applied. The court below was in error in not carrying out this provision of the agreement. It is plain and unambiguous and needs no discussion. It states: "Pending the sale of the securities and the collection or liquidation of the certificates of deposit, mortgages and assignment of bond and mortgage pledged hereunder, the parties of the first part shall be entitled to continue to collect and receive the interest and dividends which may be payable thereon, and after any such

sale and collection or liquidation shall be entitled to receive such interest as may be realized upon the fund obtained therefrom," and it is only when they are actually applied to the impairment of the capital that this requirement ceases.

Under the foregoing discussion we sustain the court below in the discharge of the rule, but do so without prejudice to the petitioners' right to raise the question of novation and release from liability in the courts of Lackawanna County, and also to secure from the liquidator the interest and earnings from the certificates of deposit which have been retained.

The decree of the court below is affirmed without prejudice, costs to be paid by appellants.